*488 DECISION ON APPEAL
GUERNSEY, Chief Judge.
In this appeal from the judgment of the Gaming Disputes Trial Court, Miller v. Mohegan Tribal Gaming Authority, 2 G.D.R. 149, 6 Am. Tribal Law 543, 2005 WL 6239001 (2005), (Eagan, J.), the Plaintiff/Appellant challenges the Trial Court’s refusal to adopt a negative inference from the Defendant’s reuse (and therefore destruction) of surveillance video images [1], not of the fall itself in which the Plaintiff sustained injury[2], but rather the digital video images showing the scene of the fall for an unspecified period of time preceding the accident. It is Plaintiff/Appellant’s contention that the Trial Court should adopt the negative inference that the video images for a period of time prior to the fall would have shown no producing cause for the condition of the floor on which Plaintiff fell, thus establishing that such condition had existed for a sufficient period of time to satisfy the requirement of constructive notice. McCrorey v. Heilpern, 170 Conn. 220, 221, 365 A.2d 1057 (1976); Schiff v. Mohegan Tribal Gaming Authority, 2 G.D.R. 117, 118, 6 Am. Tribal Law 519, 2005 WL 6238998 (2005); Harris v. Mohegan Tribal Gaming Authority, 1 G.D.R. 86, 87 (2004).
In its decision, the Gaming Disputes Trial Court found that the Plaintiff had pro-dueed no evidence of the length of time that the clear, wet substance had been on the floor where the Plaintiff fell[3], and declined to fill this evidentiary void with a permissive negative inference from Defendant’s failure to maintain the video for some arbitrary period before the accident. We hold that the Plaintiff/Appellant has failed to establish that the Trial Court’s refusal to adopt such a permissive inference was clearly erroneous, and affirm the judgment of the Trial Court.
The Plaintiff has alleged, and proved to the satisfaction of the Trial Court, that on July 17, 2003 she was a patron/invitee at the Mohegan Sun Casino, and slipped and fell as a result of a clear, wet substance on the floor in the area leading to a ladies restroom in the Casino of the Sky, suffering injuries. At trial, the Plaintiff testified that she did not see that liquid on the floor before she fell and did not know how long it had been there or how it got there.[4] The videotape of the incident, introduced at trial,[5] commences only seconds before the Plaintiff fell and provides no evidence as to how long the substance (not visible on the tape) had been there or how it got there.
At the Mohegan Sun Casino, the Defendant maintains approximately 2,000 surveillance cameras and 1,000 security cameras.[6] The surveillance cameras are intended to watch the gaming areas of *489 the Casino and the security cameras are directed toward the “back of the house, customer and employee areas.”[7] The digital video images from each camera are “written over” after seven days in view of the expense of maintaining such an extensive digital archive.[8] Upon a request from Surveillance Operations or the Security Department, received before the digital record is written over, the requested video in digital form is copied on to a videotape. The videotape introduced as Defendant’s Exhibit D, was actually taken by a surveillance (gaming) camera, and was requested by Security, which does not have access to the surveillance/gaming videos.[9] Once security has obtained the videotape with the copied images, the tape is forwarded to the Defendant’s Risk Management Department, which can request additional footage if the request is made within the seven day retention period.[10]
As for the length of time for which video images are copied on to videotape, testimony at trial indicated that the usual procedure would be for a security officer responding to an accident to ask the patron involved what time it occurred, and then order from Surveillance a tape of the incident involved, and perhaps five to fifteen minutes before that in order to ensure that the tape includes the incident.[11] There is no attempt to order a videotape showing the condition of the floor for any particular period of time before the incident.
Discussion
In 1996 the Connecticut Supreme Court for the first time addressed the issue of spoliation of evidence in the context of a civil case. In Beers v. Bayliner Marine Corporation, Et Al, the Court adopted the rule of a majority of the jurisdictions to consider the issue, and held that, in a civil context, the trier of fact “may draw an inference from the intentional spoliation of evidence that the destroyed evidence would have been unfavorable to the party that destroyed it.” Beers v. Bayliner Marine Corporation, Et Al, 236 Conn. 769, 774-75, 675 A.2d 829 (1996). To do so, the trier of fact must be satisfied; first, that the spoliation was intentional; second that the destroyed evidence was relevant to the issue pertaining to which the inference is sought; and third, that the party seeking the inference must have acted with due diligence with respect to the spoliated evi- *490 deuce. Finally, the Court emphasized that the inference is permissive, not required:
Finally, the1 jury, if it is the trier of feet, must be instructed that it is not required to draw the inference that the destroyed evidence would be unfavorable but that it may do so upon being satisfied that the above conditions have been met.
236 Conn. at 777-79, 675 A.2d 829.
As to the first issue, that the spoliation was intentional, the Beers Court emphasized that there need not be an intent to perpetrate a fraud, “but, rather, that the evidence had been disposed of intentionally and not merely destroyed inadvertently.” 236 Conn. at 777, 675 A.2d 829. The Court proceeded to cite, with seeming approval, State v. Langlet, 283 N.W.2d 330, 333 (Iowa, 1979), however, for the proposition that the “spoliation inference [is] not appropriate when destruction is not intentional or is merely matter of routine procedure” 236 Conn. at 777-78, 675 A.2d 829.
In the instant case, there appears to be no question as to the diligence of the party seeking the inference,[12] nor of its relevance[13] to the present consideration of the requirement of constructive notice. As to the issue of the intentional destruction of the video images preceding the Plaintiffs fall, although the Trial Court questioned whether the same had been shown in this case,[14] resolution of this issue is unnecessary in view of the clear refusal of the Court to draw the pel-missive inference that the destroyed evidence would be unfavorable to the Defendant:[15]
While Plaintiff asks the Court to infer the destroyed tape would have shown the wet surface had existed for a sufficient amount of time to constitute constructive notice, it is equally possible the destroyed videotape would have shown another patron spilling a glass of water only moments before plaintiff slipped and fell.
It is well established that the review by this Court as to the findings of fact by the Trial Court is limited, and that such findings must stand unless clearly erroneous as a matter of law. Alday v. Mohegan Tribal Qaming Authority, 1 G.D.A.P. 25. 26, 6 Am. Tribal Law 476, 478-79 2005 WL 6237209 (2005).[16] In view of the whole *491 record, including evidence that no employee or agent of the Defendant had viewed the unpreserved video images (and therefore could not know whether they would be helpful or damaging to the Defendant’s position), this Court cannot find the refusal of the Trial Court to adopt a permissive, negative inference to be clearly erroneous.[17]
Finally, the extent to which the Trial Court gave careful consideration to the permissive negative inference is emphasized by the Court’s rather unique dicta concerning future destruction of video images:
In future cases, however, the Court assumes that no videotapes relevant to a pending issue will be destroyed. The defendant’s future destruction of such evidence will make it exceedingly difficult to find the destruction was unintentional.
This carefully crafted compromise, upon which both the Plaintiff and Defendant agree (for future cases, at least), presents a reasoned adaptation of the rule regarding spoliation of evidence to the unique situation presented by a casino with three thousand surveillance and security cameras, installed not for the purpose of use by the Gaming Disputes Court in personal injury litigation, but rather for use by the Tribal Gaming Commission in maintaining the integrity of the gaming operation.[18] The Trial Court’s decision properly leaves articulation of the calculation of the period of video image time to be preserved to future cases, but places the Defendant on firm notice of the potential significance of such video images which, in many cases, ean provide evidence crucial both to plaintiffs and defendants, unobtainable by any other means.[19]
The judgment of the Trial Court is affirmed.[20]

. The surveillance video is digitally recorded and, upon request, "dubbed” (copied) on to a videotape for use by the Defendant’s Risk Management Department, which videotape was subsequently turned over to counsel for the Plaintiff and introduced into evidence at trial.

. The video of the Plaintiffs fall was dubbed on to a videotape and leaves no doubt that the Plaintiff fell as a result of the condition of the floor, although the clear, wet substance on which Plaintiff claimed to have slipped is not visible.

. The Trial Court clearly did not view evidence that one of the three environmental services employees assigned to the rotunda area was on break from 10:00 p.m. to 10:30 p.m. (the Plaintiff fell at approximately 10:25 p.m.) as evidence of the length of time the substance had been present. See Transcript at 94.

. Transcript at 33.

. Defendant’s Exhibit D.

. Transcript at 105.

. Transcript at 111.

. Transcript at 113-14. This is in accordance with the requirements of Appendix A to the Mohegan Tribe—State of Connecticut Gaming Compact. See footnote 18, supra.

. Transcript at 111-12. For a surveillance/gaming recording, the videotape would have been considered unusually short, inasmuch as surveillance/gaming requests are typically for a longer period of time. Transcript at 113. At trial, testimony indicated that initially there was some confusion with respect to whether the images on this tape were taken by a security or surveillance/gaming camera; however, it was determined that they were taken by a surveillance/gaming camera that also happened to record the non-gaming area where Plaintiff fell.

. Transcript at 113.

. THE COURT; I have a.question. When you order up the videotape that shows the incident where you have a condition on a floor, do you order up tape before that to see how long that condition existed on the floor?
1 HE WITNESS: No. We ask the patron roughly what time it occurred and that's where we go—I usually give it another five minutes prior to that because you never know if the clocks are different on the videotaping compared to people’s watches. I may even go 15 minutes ahead of that so that way they [have] something to look for ahead of time. And that's where they do their review from to the point I call them.
Testimony of Theo Aubin, Security Supervisor for Mohegan Sun. Transcript at 60.

. It seems clear, and is undisputed, that the digital video record was written over long before the Plaintiffs counsel had an opportunity to request a copy. Although no evidence appears to have been introduced on the subject, there is nothing to suggest that the injured party would be given a copy of the video record even if she requested it at the time of her fall.

. It should be noted, however, that it is far from clear that the relevance of digital images of the scene of the accident for an unspecified period before the accident was apparent to anyone as of July 17, 2003, the day Plaintiff fell

. The Trial Court noted that the destruction of the video images was in accordance with a long-standing policy of the MTGA to write over existing video images "after the eighth day” iri order to avoid extensive video archives, and that all the evidence was to the effect that the Defendant had not reviewed the video for the period preceding the Plaintiff’s fall.

. 11 is aiso unnecessary, in view of the Trial Court's refusal to adopt the inference, to delve into the issue of whether such an adverse inference, standing alone, could establish a prima facie case, in light of the dispute as to whether any other evidence as to constructive notice existed. Beers v. Bayliner Marine Corp. Id. at 779, 675 A.2d 829.

. "The function of this court is not to determine whether the trial court could have reached a different conclusion other than the one reached, but rather could it reasonably have reached the one that it did.” Alday, Id. at 26, 6 Am. Tribal Law at 478-79; Allen v. Nissly, 184 Conn. 539, 542, 440 A.2d 231 (1981).

. Far from being unconcerned with the issue, the transcript of the trial reveals that it was the Trial Court that initiated and diligently pursued the issue of the destruction of video images of the scene of the accident for a period of time prior to Plaintiff’s fall.

. The Mohegan Tribe—State of Connecticut Gaming Compact, Section 7, provides that standards of operation for the Tribal Gaming Agency (MTGA), in order to "protect the public interest in the integrity of the gaming operations and .. . reduce the dangers of unsuitable, unfair or illegal practices and methods and activities in the conduct of gaming.” The initial standards are set forth in Appendix A, and provide, inter alia, as follows'.
(6) Closed Circuit Television System
(6) Video or audio tapes shall be retained for at least seven (7) days and at least thirty (30) days in the case of tapes of evidentiary value, or for such longer period as the Commission or, in the event of any criminal investigation, the State law enforcement agency may require.

. The practical effect of this dicta is likely to be the removal, in many cases, of the "routine procedure” exception to the requirement that the spoliation be intentional, and to expand the focus of the efforts of the Defendant’s Security and Risk Management Departments to preserve evidence, unobtainable in almost any other situation, to include evidence crucial to the outcome of so many cases involving constructive notice. Nevertheless, it should be emphasized that the inference remains permissive, not mandatory, which the Trial Court is free to accept or reject under the circumstances of each case. As such, the Plaintiffs argument that the Trial Court's prospective ruling on this issue casts its decision into the category of "justice delayed is justice denied” is misplaced; the Trial Court's Memorandum of Decision makes clear that, under the facts of this case, it chose not to adopt the inference.

. Manfredi, J„ did not participate in the appellate proceedings.